## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>United States Department of Justice<br>Antitrust Division<br>450 Fifth Street, N.W., Suite 8700<br>Washington, D.C.  20530<br><br>   Plaintiff<br><br>    v.<br><br>STAR ATLANTIC WASTE HOLDINGS, L.P.<br>277 Park Avenue, 45th Floor<br>New York, NY  10172,<br><br>VEOLIA ENVIRONNEMENT S.A.<br>36/38 avenue Kléber<br>Paris, 75116<br>France,<br><br>    and<br><br>VEOLIA ES SOLID WASTE, INC.<br>200 E. Randolph Street, Suite 7900<br>Chicago, IL  60601<br><br>   Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____

## <u>COMPLAINT</u>

Plaintiff, the United States of America ("United States"), acting under the direction of the

Attorney General of the United States, brings this civil antitrust action against defendants Star

Atlantic Waste Holdings, L.P. ("Star Atlantic") and Veolia Environnement S.A to enjoin Star

Atlantic's proposed acquisition of Veolia Environnment S.A.'s U.S. subsidiary, Veolia ES Solid

Waste, Inc. ("Veolia").  Plaintiff complains and alleges as follows:

## I.      NATURE OF THE ACTION

1.      Pursuant to a share purchase agreement dated July 18, 2012, Star Atlantic proposes to acquire all of the outstanding shares of Veolia's common stock.  Defendants Star Atlantic and Veolia currently compete to provide small container commercial waste collection and municipal solid waste ("MSW") disposal in certain geographic areas in the United States.  The proposed transaction would substantially lessen competition for small container commercial waste collection services as a result of Star Atlantic's acquisition of Veolia in the Macon, Georgia area.  The proposed transaction also would substantially lessen competition for MSW disposal service as a result of Star Atlantic's acquisition of Veolia's MSW disposal assets in Northern New Jersey and Central Georgia.

2.      Defendants Star Atlantic and Veolia are two of only a few significant providers of small container commercial waste collection services in the Macon Metropolitan Area and MSW disposal services in Northern New Jersey and Central Georgia.  Unless the acquisition is enjoined, consumers of small container commercial waste collection and/or MSW disposal services in these areas likely will pay higher prices and receive fewer services as a consequence of the elimination of vigorous competition between Star Atlantic and Veolia.  Accordingly, Star Atlantic's acquisition of Veolia would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.     THE DEFENDANTS AND THE TRANSACTION

3.      Star Atlantic is a Delaware limited partnership with its headquarters in New York, New York.  Star Atlantic provides collection, transfer, recycling, and disposal services in Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina and Tennessee through its subsidiary Advanced Disposal Services, Inc., and in Massachusetts, Vermont, New York,

New Jersey, Pennsylvania, Maryland, and West Virginia through its subsidiary, Interstate Waste Services, Inc.  In 2011, Star Atlantic had estimated total revenues of $563 million.

4.     Veolia Environnement S.A. is a French corporation, with a wholly-owned subsidiary, Veolia ES Solid Waste, Inc., that offers collection, transfer, recycling, and disposal services in Florida, Georgia, Alabama, Kentucky, Missouri, Illinois, Minnesota, Wisconsin, Michigan, Indiana, Pennsylvania, and New Jersey.  In 2011, Veolia ES Solid Waste, Inc. had estimated total revenues of $818 million.

5.     On July 18, 2012, defendants Star Atlantic and Veolia entered into a share purchase agreement pursuant to which Star Atlantic proposes to acquire all of the outstanding shares of Veolia's common stock in a transaction valued at $1.9 billion.

## III.    JURISDICTION AND VENUE

6.     The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, as amended, to prevent and restrain defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

7.     Defendants Star Atlantic and Veolia collect MSW from residential, commercial, and industrial customers, and they own and operate transfer stations and landfills that process and dispose of MSW.  In their small container commercial waste collection and MSW disposal businesses, Star Atlantic and Veolia make sales and purchases in interstate commerce, ship waste in the flow of interstate commerce, and engage in activities substantially affecting interstate commerce.  The Court has jurisdiction over this action and over the parties pursuant to 15 U.S.C. § 22, and 28 U.S.C. §§ 1331 and 1337.

8.      Defendants have consented to venue and personal jurisdiction in the District of

Columbia.  Venue is therefore proper in this district under Section 12 of the Clayton Act, 15

U.S.C. § 22, and 28 U.S.C. § 1391(c).

## IV.      TRADE AND COMMERCE

### A.      The Relevant Service Markets

#### 1.      Small Container Commercial Waste Collection

9.      Waste collection firms, or "haulers," collect MSW from residential, commercial,

and industrial establishments and transport the waste to a disposal site, such as a transfer station,

landfill, or incinerator, for processing and disposal.  Private waste haulers typically contract

directly with customers for the collection of waste generated by commercial accounts.  MSW

generated by residential customers, on the other hand, often is collected either by local

governments or by private haulers pursuant to contracts bid by, or franchises granted by,

municipal authorities.

10.      "Small container commercial waste collection" means the business of collecting

MSW from commercial and industrial accounts, usually in dumpsters (*i.e.*, a small container with

one to ten cubic yards of storage capacity), and transporting or "hauling" such waste to a

disposal site by use of a front-end or rear-end load truck.  Typical small container commercial

waste collection customers include office and apartment buildings and retail establishments (*e.g.*,

stores and restaurants).  As used herein, "small container commercial waste collection" does not

include the collection of roll-off containers or residential collection service.

11.      Small container commercial waste collection service differs in many important

respects from the collection of residential or other types of waste.  An individual commercial

customer typically generates substantially more MSW than a residential customer.  To handle

this high volume of MSW efficiently, haulers often provide commercial customers with small containers, also called dumpsters, for storing the waste.  Haulers organize their commercial accounts into routes, and collect and transport the MSW generated by these accounts in front-end load ("FEL") trucks uniquely well-suited for commercial waste collection.  Less frequently, haulers may use more maneuverable, but less efficient, rear-end load ("REL") trucks, especially in those areas in which a collection route includes narrow alleyways or streets.  FEL trucks are unable to navigate narrow passageways easily and cannot efficiently collect the waste located in them.

   12.    On a typical small container commercial waste collection route, an operator drives a FEL vehicle to the customer's container, engages a mechanism that grasps and lifts the container over the front of the truck, and empties the container into the vehicle's storage section where the waste is compacted and stored.  The operator continues along the route, collecting MSW from each of the commercial accounts, until the vehicle is full.  The operator then drives the FEL truck to a disposal facility, such as a transfer station, landfill, or incinerator, and empties the contents of the vehicle.  Depending on the number of locations and the amount of waste collected on the route, the operator may make one or more trips to the disposal facility in the servicing of the route.

   13.    In contrast to a small container commercial waste collection route, a residential waste collection route is significantly more labor-intensive.  The customer's MSW is stored in much smaller containers (*e.g.*, garbage bags or trash cans) and, instead of FEL trucks, waste collection firms routinely use REL or side-load trucks manned by larger crews (usually, two-person or three-person teams).  On residential routes, crews generally hand-load the customer's MSW, typically by tossing garbage bags and emptying trash cans into the vehicle's storage

5

section. Because of the differences in the collection processes, residential customers and commercial customers usually are organized into separate routes.

14. Likewise, other types of collection activities, such as the use of roll-off containers (typically used for construction debris) and the collection of liquid or hazardous waste, are rarely combined with small container commercial waste collection. This separation of routes is due to differences in the hauling equipment required, the volume of waste collected, health and safety concerns, and the ultimate disposal option used.

15. The differences in the types and volume of MSW collected and in the equipment used in collection services distinguish small container commercial waste collection from all other types of waste collection activities. Absent competition from other small container commercial waste collection firms, a small container commercial waste collection service provider profitably could increase its charges without losing significant sales or revenues to firms engaged in the provision of other types of waste collection services. Thus, small container commercial waste collection is a line of commerce, or relevant service, for purposes of analyzing the effects of the acquisition under Section 7 of the Clayton Act, 15 U.S.C. § 18.

### 2. Disposal of Municipal Solid Waste

16. "MSW" means municipal solid waste, a term of art used to describe solid putrescible waste generated by households and commercial establishments such as retail stores, offices, restaurants, warehouses, and non-manufacturing activities in industrial facilities. MSW does not include special handling waste (*e.g.*, waste from manufacturing processes, regulated medical waste, sewage, and sludge), hazardous waste, or waste generated by construction or demolition sites. MSW has physical characteristics that readily distinguish it from other liquid or solid waste.

17.     In order to be disposed of lawfully, MSW must be disposed in a landfill or an incinerator, and such facilities must be located on approved sites and operated under prescribed procedures.  Federal, state, and local safety, environmental, zoning, and permit laws and regulations dictate critical aspects of storage, handling, transportation, processing, and disposal of MSW in each market.  In less densely populated areas of the country, MSW often is disposed of directly into landfills that are permitted and regulated by the state.  Landfill permit restrictions often impose limitations on the type and amount of waste that can be deposited.  In many urban and suburban areas, landfills are scarce due to high population density and the limited availability of suitable land.  Accordingly, MSW generated in such areas often is burned in an incinerator or taken to a transfer station.  A transfer station is an intermediate disposal site for the processing and temporary storage of MSW before transfer, in bulk, to more distant landfills or incinerators for final disposal.  Anyone who fails to dispose of MSW in a lawful manner can be subject to severe civil and criminal penalties.

18.     Because of the strict laws and regulations that govern the disposal of MSW, there are no good substitutes for MSW disposal in landfills or incinerators, or at transfer stations located near the source of the waste.  Absent competition from other providers of MSW disposal services, a firm providing MSW disposal services profitably could increase its charges to haulers of MSW without losing significant sales to any other firm.  Thus, disposal of MSW is a line of commerce, or relevant service, for purposes of analyzing the effects of the acquisition under Section 7 of the Clayton Act, 15 U.S.C. § 18.

B.      **Relevant Geographic Markets**

1.      **Small Container Commercial Waste Collection**

19.      Small container commercial waste collection is generally provided in highly

localized areas because, to operate efficiently and profitably, a hauler must have sufficient

density (*i.e.*, a large number of commercial accounts that are reasonably close together) in its

small container commercial waste collection operations.  If a hauler has to drive significant

distances between customers, it earns less money for the time the truck is operating.  For the

same reason, the accounts must be near the operator's base of operations. It is economically

impractical for a small container commercial waste collection firm to service metropolitan areas

from a distant base, which requires that the FEL truck travel long distances just to arrive at its

route.  Haulers, therefore, generally establish garages and related facilities within each major

local area served.

20.      In Bibb, Jones, Peach, Monroe, and Crawford Counties in Georgia (the "Macon

Metropolitan Area"), a local small container commercial waste collection firm, absent

competition from other small container commercial waste collection firms, profitably could

increase charges to local customers without losing significant sales to more distant competitors.

Accordingly, the Macon Metropolitan Area is a section of the country, or relevant geographic

market, for purposes of analyzing the effects of the acquisition under Section 7 of the Clayton

Act, 15 U.S.C. § 18.

2.      **Disposal of Municipal Solid Waste**

21.      MSW is transported by collection trucks to landfills and transfer stations, and the

price and availability of disposal sites close to a hauler's routes is a major factor that determines

a hauler's competitiveness and profitability.  The cost of transporting MSW to a disposal site

often is a substantial component of the cost of disposal.  The cost advantage of local disposal sites limits the areas where MSW can be transported economically and disposed of by haulers and creates localized markets for MSW disposal services.

22.     In Bergen and Passaic Counties in New Jersey ("Northern New Jersey") and in Bibb, Jones, Peach, Monroe, Crawford, Twiggs, Taylor, Macon, and Houston Counties in Georgia ("Central Georgia"), the high costs of transporting MSW, and the substantial travel time to other disposal facilities based on distance, natural barriers, and congested roadways, limit the distance that haulers of MSW generated in those areas can travel economically to dispose of their waste.  The firms that compete for the disposal of MSW generated in each of these areas own landfills or transfer stations located within the area.  In each area, absent competition from other local MSW disposal operators, a firm providing MSW disposal services profitably could increase its charges for the disposal of MSW generated in the area without losing significant sales to more distant disposal sites.  Accordingly, Northern New Jersey and Central Georgia are relevant geographic markets for purposes of analyzing the competitive effects of the acquisition under Section 7 of the Clayton Act, 18 U.S.C. § 15.

## C.     Anticompetitive Effects of the Proposed Acquisition

23.     The acquisition of Veolia by Star Atlantic would remove a significant competitor in small container commercial waste collection or the disposal of MSW in already highly concentrated and difficult-to-enter markets.  In each of these markets, the resulting significant increase in concentration, loss of competition, and absence of any reasonable prospect of significant new entry or expansion by market incumbents likely will result in higher prices for the collection of small container commercial waste or the disposal of MSW.

1.     **Small Container Commercial Waste Collection Service in the Macon Metropolitan Area**

24.     In the Macon Metropolitan Area, the proposed acquisition would reduce from four to three the number of significant competitors in the collection of small container commercial waste.  Annual revenue from small container commercial waste collection in the Macon Metropolitan Area is approximately $7.1 million.  After the acquisition, Star Atlantic would have approximately 80 percent of the total number of small container commercial waste collection routes in the market.  Using a standard measure of market concentration called the "HHI" (defined and explained in Appendix A), incorporating market shares based on small container commercial waste collection routes, the post-merger HHI for small container commercial waste collection in the Macon Metropolitan Area would be approximately 6,595, an increase of 1,714 points over the pre-merger HHI of 4,881.

2.     **MSW Disposal in Central Georgia**

25.     In Central Georgia, the proposed acquisition would reduce from four to three the number of significant competitors for the disposal of MSW.  After the acquisition, defendants would have approximately 77 percent of the MSW disposal market based on waste tonnages accepted by the landfills in 2011.  The post-merger HHI for MSW disposal service in Central Georgia would be approximately 6,093, an increase of 2,942 points over the premerger HHI of 3,151.

3.     **MSW Disposal in Northern New Jersey**

26.     In Northern New Jersey, the proposed acquisition would reduce from four to three the number of significant competitors for the disposal of MSW.  Annual revenue from MSW disposal in this market is approximately $65 million.  After the acquisition, defendants would

have approximately 40 percent of the MSW disposal market.  Using market shares based on

2011 tonnages as a measure of concentration, the post-merger HHI for MSW disposal service

would be approximately 2,701, an increase of 719 points over the pre-merger HHI of 1,982.

> **D.**     **Entry into Small Container Commercial Waste Collection in the Macon Metropolitan Area**

27.     Significant new entry into small container commercial waste collection is difficult

and time-consuming in the Macon Metropolitan Area.  A new entrant into small container

commercial waste collection cannot provide a significant competitive constraint on the prices

charged by market incumbents until it achieves minimum efficient scale and operating

efficiencies comparable to existing firms.  In order to obtain a comparable operating efficiency, a

new firm must achieve route densities similar to those of firms already competing in the market.

However, the incumbent's ability to engage in price discrimination and to enter into long-term

contracts with collection customers is often effective in preventing new entrants from winning a

large enough base of customers to achieve efficient routes in sufficient time to constrain the post-

acquisition firm from significantly raising prices.  Differences in the service provided by an

incumbent hauler to each customer permit the incumbent easily to meet competition from new

entrants by pricing its services lower to any individual customer that wants to switch to the new

entrant.  Incumbent firms frequently also use three- to five-year contracts, which may

automatically renew or contain large liquidated damage provisions for contract termination.

Such contracts make it more difficult for a customer to switch to a new hauler in order to obtain

lower prices for its collection service.  By making it more difficult for new haulers to obtain

customers, these practices increase the cost and time required by an entrant to form an efficient

route, reducing the likelihood that the entrant ultimately will be successful.

### E.      Entry into MSW Disposal in Northern New Jersey and Central Georgia

28.      Significant new entry into the disposal of MSW in Northern New Jersey and Central Georgia would be difficult and time-consuming.  Obtaining a permit to construct a new disposal facility or to expand an existing one is a costly and time-consuming process that typically takes many years to conclude.  First, suitable land is scarce.  Second, even when land is available, local public opposition often increases the time and uncertainty of successfully permitting a facility.  Last, it is also difficult to overcome environmental concerns and satisfy other governmental requirements.

29.      Where it is not practical to construct and permit a landfill, it is necessary to use a transfer station to facilitate the use of more distant disposal options.  Many of the problems associated with the permitting and construction of a landfill likewise make it difficult to permit and construct a transfer station.

30.      In Northern New Jersey and Central Georgia, entry by constructing and permitting a new MSW disposal facility would be costly and time-consuming, and unlikely to prevent market incumbents from significantly raising prices for the disposal of MSW following the acquisition.

## V.      VIOLATIONS ALLEGED

31.      Star Atlantic's proposed acquisition of Veolia's outstanding shares likely would lessen competition substantially for small container commercial waste collection services in the Macon Metropolitan Area and for MSW disposal services in Northern New Jersey and Central Georgia, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

32.     Unless enjoined, the proposed acquisition likely would have the following anticompetitive effects relating to small container commercial waste collection services, among others:

      (a)     actual and potential competition between Star Atlantic and Veolia would be eliminated;

      (b)     competition likely would be lessened substantially; and

      (c)     prices likely would increase.

33.     Unless enjoined, the proposed acquisition likely would have the following anticompetitive effects relating to MSW disposal, among others:

      (a)     actual and potential competition between Star Atlantic and Veolia would be eliminated;

      (b)     competition likely would be lessened substantially; and

      (c)     prices likely would increase.

## VI.     REQUESTED RELIEF

34.     Plaintiff requests that this Court:

      (a)     adjudge and decree that Star Atlantic's acquisition of Veolia would be unlawful and violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

      (b)     permanently enjoin and restrain defendants and all persons acting on their behalf from consummating the proposed acquisition of Veolia by Star Atlantic, or from entering into or carrying out any other contract, agreement, plan, or understanding, the effect of which would be to combine Star Atlantic with Veolia;

      (c)     award the United States such other and further relief as the Court deems just and proper; and

(d)    award the United States its costs for this action.

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____
Joseph F. Wayland
Acting Assistant Attorney General


_____
Renata B. Hesse (D.C. Bar #466107)
Deputy Assistant Attorney General


_____
Patricia A. Brink
Director of Civil Enforcement


_____
Maribeth Petrizzi (D.C. Bar #435204)
Chief, Litigation II Section


_____
Dorothy B. Fountain (D.C. Bar #439469)
Assistant Chief, Litigation II Section

_____
Michael K. Hammaker (D.C. Bar #233684)
Kerrie J. Freeborn (D.C. Bar #503143)
Dando B. Cellini
Frederick H. Parmenter

Attorneys
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 8700
Washington, D.C.  20530
(202) 307-0938



Dated:  November 15 , 2012

### APPENDIX A

The term "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration.  The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).  The HHI takes into account the relative size distribution of the firms in a market.  It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1,500 and 2,500 points are considered to be moderately concentrated, and markets in which the HHI is in excess of 2,500 points are considered to be highly concentrated.  *See* U.S. Department of Justice & FTC, *Horizontal Merger Guidelines* § 5.3 (2010).  Transactions that increase the HHI by more than 200 points in highly concentrated markets presumptively raise antitrust concerns under the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission.  *See id.*